[Crim. No. 288. Fifth Dist. July 25, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. TEOFILO GONZALES GOMEZ et al., Defendants and Appellants.

Howard W. Bailey and James K. Kobota, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Christopher Longaker, Deputy Attorneys General, for Plaintiff and Respondent.

STONE, J.—A jury convicted the defendants, Teofilo Gomez and Gilbert Gomez, of the crimes of kidnaping for robbery, accompanied by bodily harm, in violation of Penal Code section 209, sex perversion in violation of Penal Code section 288a, sodomy in violation of Penal Code section 286, and robrey, of the second degree, in violation of Penal Code section 211. The trial judge denied probation and a new trial, and defendants were sentenced. This appeal followed.

Defendants assert the following grounds for reversal: (1) the trial judge erred in admitting their extrajudicial statements which they contend were obtained in violation of their constitutional rights; (2) extrajudicial statements inconsistent with Gilbert's testimony called for separate trials under the rule of *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] ; (3) they were deprived of the testimony of a proposed defense witness; (4) a carnival atmosphere was created during the trial by a visiting senior class of a high school; (5) misconduct of the prosecutor in argument; (6) improper comment by the judge on Teofilo's failure to testify; (7) the convicting evidence was inherently improbable; (8) insufficiency of the evidence; (9) they have suffered double punishment; (10) the court exceeded its jurisdiction in suspending certain sentences after denying probation.

Danny Langdon, the victim, a sailor stationed at the Naval Air Station at Lemoore, California, visited Fresno on a weekend pass on January 28 and 29, 1966. He and another sailor, Henry Trudell, spent the night at the Californian Hotel and were together on January 29 until about 2 p.m., when it was agreed that Danny would return to the base, pick up Henry's car and return to Fresno later that evening.

Danny walked to the bus stop at the corner of California and Elm Avenues. About 3 p.m. he hitchhiked a ride with the defendants and one Frank, who agreed to take him to the base. At that time Teofilo was driving, Frank was in the right front seat, and Gilbert sat in the rear seat with Danny. After driving southerly on Highway 41 a few miles, they asked Danny how much money he had and he replied ''$2.'' Frank and Teofilo purchased some beer at a grocery store with money collected from the group, Danny contributing $1.00. A few miles further on they stopped at a service station where Teofilo and Gilbert used the restroom. Frank suggested making a detour by the home of his aunt to obtain more money, and Danny agreed upon the promise of the defendants to then

drive him to the base. They left Highway 41 and for approximately three hours traveled over country roads.

Shortly after leaving the highway, Frank changed places with Gilbert and sat in the rear seat with Danny. Frank made improper advances to Danny, who resisted. Teofilo told him to do what Frank said or they would beat him up badly or kill him. In fear of a severe beating or possibly death, Danny, upon direction of Teofilo and Frank, committed an act of oral copulation upon Frank, became ill, and thrust his head out of the car window and vomited. He then was ordered to undress, and did so except for an undershirt and socks, placing his clothing on the floor of the rear seat. Frank then committed an act of sodomy upon him, which caused him pain. The defendants then, in turn, changed places, each taking his place in the rear seat and each forcing Danny, through threats of a beating or death, to submit to the same acts. Each act of oral copulation caused him nausea, and each act of sodomy caused him physical pain. He testified that he repeatedly asked, to no avail, that he be taken back to Highway 41 and let out, or be taken to the base; to the contrary, the defendants threatened to beat or kill him if he did not submit. After the three acts of copulation and the three acts of sodomy were completed, Danny was told to dress. He discovered that his clothing had been placed on the front seat, and when he recovered his pants he noticed his wallet was missing, and demanded its return. Frank and Teofilo told him they were not going to give it back. Frank grabbed his sweater, stating he would not give it back because "he liked it and wanted it." A silver colored Zippo lighter was also missing; it was subsequently found by the police under the front seat of Gilbert's car.

Danny was let out of the car near the intersection of Clarkson and Cedar, in a rural area of the county. It was getting dark but there was still some daylight and the license plate of the car was lighted so that he could see the number, EUD 157, which he kept repeating to himself. He ran to a farmhouse about a quarter of a mile away and asked Mrs. Rhodes for a pencil. He said he wanted to use the telephone in order to call the police. Mrs. Rhodes produced a pencil, and Danny wrote the license number on her telephone book, which book was introduced in evidence. Danny, who was distraught, explained to Mr. and Mrs. Rhodes he had been "rolled" by men who were sex perverts. He described the automobile and the men to the police officers. By tracing the license number, the officers

learned the car was owned by Gilbert Gomez. The car was located and defendants were arrested.

Danny identified the defendants from a group of five or six photographs shown to him by the police; he subsequently selected the defendants from a lineup of six men; and he made a positive courtroom identification of both defendants.

Teofilo did not testify, but his extrajudicial statements were admitted in evidence. Gilbert testified that he met Danny at the Mall during the morning hours; that he gave Danny a ride and Danny attempted to induce him to commit a homosexual act, whereupon he ordered Danny out of the car.

Both Danny and Henry Trudell testified that they were together constantly during the morning hours, and in detail related their activities.

In his statement before trial, Gilbert said that during the afternoon in question he was at the home of his girlfriend, Janet Clavery. Janet testified that he was at her home during the morning hours and left about noon. When he took the stand, Gilbert testified that during the afternoon of January 29 he was at home, that he washed his car about 3 o'clock and thereafter raked the yard and engaged in general cleanup chores. Thus he contradicted his own extrajudicial statements as well as Teofilo's as to his whereabouts at the time the crimes were committed, although none of the statements nor his testimony placed Gilbert at the scene of the crimes.

Defendants contend their Fifth Amendment rights were violated by police interrogation. They concede that as the trial was held before *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the principles enunciated in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], apply. (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221]; *People* v. *Hill,* 66 Cal.2d 536, 552 [58 Cal.Rptr. 340, 426 P.2d 908].) They do not deny that the admonitions given before interrogation met the *Dorado* requirements, rather, they contend the record does not reflect that they understood them.

Defendants also argue, preliminarily, that they were minors when interrogated, that "In civil matters, person not of the age of majority has no capacity to consent, and, therefore, are clothed with the right of disaffirmance," and that it follows they were "clothed with incapacity to consent in waiving their rights toward self-incrimination."

In fairness to defendants, this contention was made before

the United States Supreme Court decided *Application of Gault,* 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], holding that the constitutional rights enumerated in *Miranda,* which adhere to adults in state courts via the Fourteenth Amendment, apply with equal vigor to minors. ▮ The age of a minor may have a bearing on his understanding of his constitutional rights when explained to him, but it does not confer upon the minor the right, ipso facto, to disaffirm a waiver merely by asserting his non-age at the trial.

We turn, then, to the question whether defendants understood their constitutional rights. They assert the record is silent on the point and that presuming a waiver from a silent record is impermissible. (*People* v. *Davis,* 66 Cal.2d 175, 180 [57 Cal.Rptr. 130, 424 P.2d 682], and cases cited therein.) In discussing a silent record, the *Davis* case makes it clear that the prosecution has the burden of laying a foundation for the admission in evidence of a defendant's extrajudicial statement. But the question here is whether the evidence purporting to lay such foundation is sufficient to overcome the silent-record presumption.

The arresting officers traced ownership of the car to Gilbert through the license number obtained by the victim. It was occupied by defendants, Gilbert and Teofilo, and a third man identified as Frank. The officers had the three young men identify themselves, and then advised them that they were under arrest for suspicion of robbery, kidnaping and sex perversion. One of the officers identified himself, showed the three suspects his credentials, and then advised them of their constitutional rights by reading from a card designed for that purpose. After reading the printed catalogue of rights, the arresting officer asked the three suspects if they understood what he had read and whether they wanted him to repeat it. The defendants, Gilbert and Teofilo, said they did not want to be readvised of their rights. The third man said he did not understand English very well, so he was taken to the sheriff's office and an interpreter there read his rights to him from the printed card.

At the scene of the arrest, defendants were given a cursory interrogation pertaining mostly to their whereabouts during the day the crimes were committed. Both denied any complicity and said they were at places other than where the crimes occurred.

Later, at the sheriff's department, the defendants were again interrogated. This time a deputy district attorney

advised them of their rights, to which Gilbert's reaction was: "He stated he didn't want to say anything. He stated that he had already talked to me, as Sergeant Conway, and that he told, had told me where he was on Saturday. He did state that his girlfriend would know where he was and that he had already told me what her name was; that he wasn't trying to be smart; that he just didn't want to say anything, and that's about the extent of his statement."

Thus Gilbert's preface to or explanation of the exercise of his right to remain silent manifests an understanding that belies defendants' silent-record argument.

Although it is not so clear that Teofilo understood his rights and that he knowingly waived them, nevertheless, before talking he was advised of his rights, both by the arresting officer and later by the deputy district attorney. He told the officer he did not want his rights reread, and his statements that followed were completely exculpatory, relating chiefly his whereabouts and Gilbert's the day the crimes were committed. The exculpatory statements created a conflict in the evidence, however, a circumstance which we discuss below.

Whether a defendant has understood and intelligently waived a right is largely a subjective determination, presenting the trial judge with a difficult task at best, affected, undoubtedly to a degree, by the appearance and demeanor of the witnesses. An objection to evidence supporting this subjective finding, when raised in the trial court, can be explored by additional *voir dire*; on the other hand, when this contention is made for the first time on appeal, the appellate court, restricted to the printed word, is unable to go behind the prima facie sufficiency of the foundational evidence.

Manifestly, the trial judge here was satisfied that each defendant knowingly waived the rights that were defined for him, since the extrajudicial statements were admitted only after he had heard the *voir dire* examination by both prosecution and defense. The *voir dire* clearly reflected that each defendant was advised of his rights, and at this point defendants could no longer sit idly by; it was incumbent on them to affirmatively assert by specific objection that they had not understood the rights that were enumerated for them, rights they said they did not wish repeated before talking to the officers. In the face of this foundational record they cannot now rest upon the silent-record rubric.

In short, a record cannot be said to be silent where foundational evidence for admission of an extrajudicial state-

ment is produced by the prosecution and no specific objection upon the ground of lack of understanding is made by the defendant.

■ Defendants next argue that each was entitled to a separate trial, under the doctrine of *People* v. *Aranda, supra,* 63 Cal.2d 518. Gilbert said, in his statement, he was at his girlfriend's house, which Teofilo corroborated by his extrajudicial statement. At the trial, however, Gilbert testified that he was at home all afternoon, raking and cleaning up the yard. He thus contradicted not only his own extrajudicial statement but that of Teofilo.

Defendants do not point out in what manner Gilbert's statement or testimony implicated Teofilo, or vice versa. Certainly the statements were completely exculpatory; there was no accusatory statement by either defendant as to the other, whether by extrajudicial statement or by testimony. At most, the statements and testimony were inconsistent in some respects, but even the inconsistencies were not of an accusatory nature. (*People* v. *Aranda, supra,* 63 Cal.2d at p. 528; *People* v. *Charles,* 66 Cal.2d 330, 332 [57 Cal.Rptr. 745, 425 P.2d 545]; *People* v. *Hill, supra,* 66 Cal.2d at p. 558.)

An inconsistent extrajudicial statement can be inculpatory, of course; whether it is, presents a question of fact to be determined case by case. There is no inculpatory or implicating extrajudicial statement here, in the sense the words "implicate" and "inculpate" are used by the Supreme Court in the *Aranda* line of cases.

■ Even if it were error to admit in evidence the noninculpatory statement of Teofilo, the error was not prejudicial. The United States Supreme Court has not held *Aranda*-type error to present a federal constitutional question applicable to the states via the Fourteenth Amendment. Although the *Aranda* question has federal constitutional overtones (*People* v. *Massie,* 66 Cal.2d 899, 922, fn. 29 [59 Cal.Rptr. 733, 428 P.2d 869]), the case itself was not decided on constitutional grounds, so we deal here with matters of statutory construction and judicially declared rules of practice. Hence we are not compelled to follow the rule of *Fahy* v. *Connecticut,* 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229], as articulated in *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], a test which the United States Supreme Court says it prefers to the one fashioned by the California Supreme Court in *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]. (See *People* v. *Charles, supra,* 66 Cal.2d 337.)

We conclude, after an examination of the entire record, that it is not reasonably probable that a result more favorable to either defendant would have been reached had their exculpatory statements not been admitted in evidence. (Cal. Const., art. VI, § 13; *People* v. *Watson, supra.*)

 Defendants contend they were prejudiced by the inadvertent release of a witness, one Cruz, brought to Fresno pursuant to a warrant requiring his attendance as a witness at the request of defendants. The absence of Cruz cannot now be asserted as reversible error, or error at all, in the light of the following discussion between court and counsel for both defendants concerning the absence of Cruz:

"MR. BAILEY: . . . I think I can withdraw my request for all the warrants at this time. We can do that at this time.

"THE COURT: All right. So that you are not requesting, then, Cruz at this point in the case?

"MR. CAPRIOLA (Defense co-counsel) : No. If he does appear, we can put him on rebuttal.

"THE COURT: If he doesn't appear, you are no longer requesting the Sheriff's office to produce him?

"MR. BAILEY: That's right. We are no longer requesting his production.

"THE COURT: All right. Then for the record, you rest subject to this stipulation?

"MR. CAPRIOLA: That's correct, your Honor."

 Defendants next contend they were prejudiced by the appearance, for a short period of time on one day of trial, of a senior high school class. It is asserted Gilbert was affected by the presence of the students, kept his head down and spoke in a low voice. However, the record indicates that when Gilbert first took the stand and there were no students in the courtroom, his own counsel said, "Keep your head up. I can't see you when you get down too low there." And later, during direct examination and in the absence of students, defense counsel said to Gilbert, "Lift your head up." Direct examination had been completed and a substantial portion of the cross-examination was finished before the students entered the courtroom. There is nothing in the record to indicate embarrassment on the part of Gilbert, or that he dropped his head or hesitated to answer while the students were present.

Defendants also argue that the students created a carnival atmosphere in the courtroom by grinning and giggling. The only indication we find that there was anything amiss was the

statement by the court, on its own motion, to the students, as follows: ''Excuse me. Just a minute, please. The students who cannot abstain from laughter or emotional reaction will have to leave the courtroom. Your privilege to watch the trial depends upon proper deportment. I assume that high school students would have acquired this ability by at least, as I understand it, the Senior year. This is not a place of entertainment. This is a serious trial and involving serious matters. I hope that in the projection of your lives, you will realize that there is a place for everything. One of those at this time is proper deportment.''

The record presents nothing akin to *Sheppard* v. *Maxwell,* 384 U.S. 333 [16 L.Ed. 600, 86 S.Ct. 1507], cited by defense counsel in support of their position. In that case unlimited numbers of members of the various news media were permitted by the trial judge to crowd into the courtroom, to come and go at will, and at times create so much noise and confusion that witnesses and counsel could not be heard. They were permitted to sit inside the bar and to handle and photograph trial exhibits lying on the counsel table during recesses; they made it impossible for the defendant and his counsel to confer in the courtroom. They were also permitted to interview witnesses and prospective witnesses at will. In the case before us, defense counsel made no protest or objection during trial as to the conduct of the students, nor did defense counsel request the trial judge to exclude them.

We turn now to defendants' two-fold argument that the court and prosecution counsel violated the principles enunciated in *Griffin* v. *California,* 380 U.S. 609, 613 [14 L.Ed.2d 106, 109, 85 S.Ct. 1229], by commenting upon defendant Teofilo's failure to testify. The episode upon which the alleged errors are predicated occurred during argument by the deputy district attorney in which he compared the testimony of Gilbert, who did testify, with the extrajudicial statements of Teofilo. Defense counsel for Teofilo objected to the prosecutor's summary of the evidence, and the following occurred:

''MR. BAILEY: I will ask the Court again to not change the testimony. This is not in evidence, your Honor.

''THE COURT: Counsel, what is in evidence is—

''MR. BAILEY: The point of it—

''MR. TEOFILO GOMEZ: He is telling lies.

''THE COURT: Just a minute, please. I want to admonish the defendant that his opportunity to talk in this case has expired. He could have taken the stand and testified. He

elected not to do so. Therefore, he must remain silent. He can tell his attorney what he wants to tell him. You make your comments to your attorney. Your attorney will speak for you. Now, secondly, your objection is overruled. What the evidence is, members of the jury, is for the jury to determine. What the evidence interpretation should be is for the jury. What credit you shall give any witness is for the jury. Statements of the attorneys are merely their interpretations, and as we stated before, it's not evidence whatsoever. Go ahead."

■ Defendants contend the foregoing comment by the court is tantamount to comment upon defendant Teofilo's failure to testify, constituting reversible error.

The *Griffin* rule is founded on the principle that a defendant in a criminal case may not be punished for exercising his constitutional right to remain silent. (See *Chapman* v. *California, supra,* 386 U.S. 1821 [17 L.Ed.2d 705, 709, 87 S.Ct. 824, 826-827].) Thus, neither prosecutor nor court may comment on a defendant's failure to take the stand or suggest any adverse inferences which may be drawn from his silence. Here, the court was speaking, not to the jurors or for their benefit, but directly to the defendant who had interrupted the proceedings. It was merely a comment that he had not testified; it did not relate to the evidentiary effect of that failure. Moreover, the trial judge instructed the jurors, at the request of defendants, as follows: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus the decision as to whether he should testify is left to the defendant, acting with the advice and assistance of his attorney. You must not draw any inference of guilt from the fact that he does not testify, nor should this fact be discussed by you or enter into your deliberations in any way."

Manifestly, the court could have admonished the defendant to refrain from interrupting argument without stating: "He could have taken the stand and testified. He elected not to do so. Therefore, he must remain silent." However, this language when considered in context, does not constitute a violation of *Griffin,* as we see it. But, were we to consider it error, no reversal is impelled as, after reviewing the entire record, we are satisfied beyond a reasonable doubt that the error did not contribute to the verdict obtained. (*Chapman* v. *California, supra,* 386 U.S. at p. 24; 17 L.Ed.2d at p. 710, 87 S.Ct. at p. 828; *People* v. *Modesto,* 66 Cal.2d 695, et seq. [59 Cal. Rptr. 124, 427 P.2d 788].)

■ The prosecuting attorney is alleged to have misstated the evidence. We have reviewed the alleged misstatement, and we find that it was a paraphrase of the testimony, correct in substance but not verbatim. We do not see how the variance could have misled the jurors. The prosecution prefaced its opening argument with the statement that facts might be misstated during argument and the jurors should rely upon their best memory of the evidence and disregard any contrary statement made by counsel. The trial judge also cautioned that argument of counsel is not evidence, and formally charged the jury in the instructions that: ''As to any statement made by counsel in your presence concerning the facts in the case, you must not regard such a statement as evidence; . . .'' The variance between the testimony and the argument complained of is so slight that it cannot be considered prejudicial in the light of the record. (Cal. Const., art. VI, § 13; *People* v. *Watson, supra,* 46 Cal.2d 818.)

■ Defendants argue that there were inconsistencies in the testimony of the victim, particularly his uncertainty as to some minor details, which make his testimony inherently improbable. His testimony as to the criminal acts the defendants committed and the circumstances surrounding the commission of the crimes is not the least bit uncertain. Obviously the jury believed the victim, and there is ample evidence to support the conviction of each defendant of each crime. ''To warrant the rejection by a reviewing court of statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear. [Citations.]'' (*People* v. *Perrin,* 247 Cal.App.2d 838, 844-845 [55 Cal.Rptr. 847].)

We find no basis for viewing the victim's testimony as inherently improbable or unbelievable.

Defendants attack the sufficiency of the evidence to support their convictions of kidnaping and robbery, upon two grounds. First, they contend the victim voluntarily entered the car in Fresno after asking for a ride to Lemoore, that the car moved in the general direction of Lemoore at all times, that it left Highway 41, the principal thoroughfare between Fresno and Lemoore, with the consent of the victim, and that his detention was a mere incident to the crime, insufficient to constitute the crime of kidnaping. Their second argument is that it is inconceivable that the victim suffered harm by

reason of being forced to commit an act of oral copulation on the two defendants and the third occupant of the car, or by the three acts of sodomy, and that it is very unlikely that he would suffer great mental harm as an after-effect.

We think it absurd for defendants to argue that because they traveled in the general direction of Lemoore at all times the victim was being transported with his consent. It is true the victim consented to be transported to Lemoore, but he did not consent to be taken to an out-of-the-way rural area to be abused and ejected from the car. Moreover, defendants, in order to get the victim away from the main-traveled road so they could force him to commit acts of sex perversion and themselves commit acts of sex perversion upon him, lied to him about going to see a relative of one of the three criminals. The victim's consent to leave the main-traveled road was obtained by deceit. Penal Code section 209, in defining the elements of the crime of kidnaping, includes ''Any person who seizes, confines, *inveigles, entices, decoys,* abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, . . .'' (Italics added.)

Certainly the evidence amply supports the jury's verdict that defendants and their confederate inveigled, enticed and decoyed the victim away from the main-traveled road into an isolated country area where they could commit criminal acts upon him.

Furthermore, the acts were all accomplished through fear engendered by threats of great bodily harm. It is pointed out in *People* v. *De Georgio,* 185 Cal.App.2d 413, 422 [8 Cal.Rptr. 295], that the gravamen of the offense of kidnaping is some form of compulsion, and that the requisite force or compulsion need not consist of the use of actual physical force or express threats. The essence of the crime is that the victim feels compelled to obey because he fears harm or injury from the accused, and his apprehension is not unreasonable under the circumstances. (*People* v. *Dagampat,* 167 Cal.App. 2d 492, 495 [334 P.2d 581] ; *People* v. *Broyles,* 151 Cal.App.2d 428 [311 P.2d 88].)

As to the other element of kidnaping, subjecting the victim to bodily harm, the evidence is likewise sufficient to sustain the conviction. The victim testified that he was forced to commit three acts of oral copulation and after each act he vomited, and that each act of sodomy caused him pain.

After the victim was let out of the car at a rural intersec-

tion he ran to a farmhouse about a quarter of a mile away. According to the farmer's wife, the victim was very upset, nervous and shaking. He asked for permission to telephone the police but he was shaking so badly that he could not dial the telephone, his voice trembled, and she had to call the police for him and give them the license number of the car. This independent evidence that the victim was in a state of semi-shock and in great distress as a result of the acts of sex perversion he was forced to commit and the acts of sodomy committed upon him, brings the case within the rationale of *People* v. *Chessman*, 38 Cal.2d 166 [238 P.2d 1001]. We find untenable defendants' attempt to distinguish *Chessman* and the cases discussed therein from the instant case because the victim of the sex perversion and sodomy here was a male, rather than a female.

Defendants assert there was no robbery to bring the kidnaping within Penal Code section 209, and that the separate conviction of robbery is not sustained by the evidence. They argue that since they took the wallet from the trousers of the victim after the trousers were removed from his person, there was a mere theft of personal property, not robbery. However, the victim was forced to remove his trousers which contained the wallet. When his trousers were returned to him and he discovered the wallet missing, he demanded its return but defendants refused to give it back and threatened him with bodily harm should he make an attempt to regain its possession. *People* v. *Knowles*, 35 Cal.2d 175, 185 [217 P.2d 1], holds "There is no condition in the statute that kidnapping be premeditated as part of a robbery or that robbery be premeditated as part of a kidnapping."

The testimony was that when the victim put on his trousers and discovered the wallet missing, the car was in motion; he was still being detained in a moving car and the crime of kidnaping was not completed.

In the *Knowles* case the court also said, in analyzing *People* v. *Brown*, 29 Cal.2d 555 [176 P.2d 929] : "The judgment imposing the death penalty was affirmed on the ground that the taking of the wrist watch made the abduction kidnapping to commit robbery, even if the original objective were rape and the intent to rob was only an afterthought." (See *In re Ward*, 64 Cal.2d 672, 676 [51 Cal.Rptr. 272, 414 P.2d 400].)

There remains the question of double punishment in the light of cases construing Penal Code section 654. Each defendant was convicted of four separate crimes: count 1,

kidnaping for purpose of robbery; count 2, sex perversion; count 3, sodomy; count 4, robbery, second degree. Double punishment does not result from separate punishment for the crimes of sex perversion (Pen. Code, § 288a) and sodomy (Pen. Code, § 286), as each offense is a separate and distinct act and each defendant can be punished separately for each offense. (*People* v. *Hicks,* 63 Cal.2d 764, 766 [48 Cal.Rptr. 139, 408 P.2d 747].) The conviction and sentence for kidnaping for the purpose of robbery, in violation of Penal Code section 209, is likewise a separate and distinct crime from the violations of sections 288a and 286. On the other hand, the sentence for robbery, second degree, violation of Penal Code section 211, and the sentence for kidnaping for the purpose of robbery come within the proscription of Penal Code section 654 as explicated in *People* v. *McFarland,* 58 Cal.2d 748, 760 [26 Cal.Rptr. 473, 376 P.2d 449]. Kidnaping for purpose of robbery and the robbery are incidents to one objective; a defendant may be punished for either crime, but not for both.

It is customary for a reviewing court to set aside the sentence for the less serious of the crimes within the proscription of section 654, but leave standing the conviction for both crimes. *People* v. *Niles,* 227 Cal.App.2d 749, 755-756 [39 Cal. Rptr. 11], presented a different sentencing technique. The trial judge sentenced the defendant on one count but stayed execution on a second count incident to the objective of the first count pending "any appeal and during the service of any sentence the Adult Authority pronounces in connection with count 1, the burglary count, and at the completion of the service of any sentence in connection with count 1, the stay to become permanent, . . ." The Supreme Court, in the case of *In re Wright,* 65 Cal.2d 650 [56 Cal.Rptr. 110, 422 P.2d 998], by a footnote at page 703, indicates that the sentencing procedure discussed in *Niles* does not violate the spirit of Penal Code section 654.

 Apparently the trial judge attempted to follow the *Niles* formula by sentencing each defendant on count 1, kidnaping for purposes of robbery, and count 3, crime against nature, sentences to be served concurrently, and suspending the sentences as to count 2, sex perversion, and count 4, robbery second degree. The pertinent part of the sentencing reads: ". . . the execution thereof is suspended pending the outcome of any appeal that may be required to serve in a facility under the supervision of the Adult Authority of the

State of California by reason of said defendant's conviction of the offense charged in Count Three of the Information, . . .''

Palpably the court inadvertently failed to suspend imposition of sentence on counts 2 and 4 until ''the completion of any sentence the defendant may be required to serve.'' More serious than the incompletely expressed stay of sentence is the failure to provide that the stay shall become permanent at the completion of the service of any sentence in connection with counts 1 and 3. Thus sentences as to counts 2 and 4 are held in suspension indefinitely, and the sentencing is incomplete, so that the case must be sent back for re-sentencing as to those counts.

The purported sentences of each defendant as to counts 2 and 4 are set aside and the matter is remanded to the trial court for re-sentencing of each defendant as to counts 2 and 4. In all other respects the judgments are affirmed.

Conley, P. J., and Gargano, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 21, 1967. Peters, J., was of the opinion that the petition should be granted.