Filed 10/27/20  P. v. Hernandez CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDUARDO HERNANDEZ,<br><br>    Defendant and Appellant. | B300227<br>(Los Angeles County<br> Super. Ct. No. LA074325) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan M. Speer, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Colleen M. Tiedemann, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Eduardo Hernandez appeals from a judgment of conviction after a jury convicted him of attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664/187, subd. (a)),[1] and found true that he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) causing great bodily injury (§ 122022.53, subd. (d)), and committed the crime for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)).[2] In a bifurcated proceeding, defendant admitted he had suffered a prior strike. The trial court later struck defendant's prior strike (see *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497), sentenced defendant to an overall term of 40 years to life imprisonment,[3] and imposed various fines, fees, and assessments.

On appeal, defendant contends: (1) his trial counsel rendered ineffective assistance of counsel by failing to consult with or call to testify an eyewitness identification expert; (2) the trial court erred in excluding evidence showing that certain witnesses had "gang tendencies;" (3) the prosecutor's request that the court admonish defendant for disrupting the trial violated defendant's constitutional

---

[1] Unspecified references to statutes are to the Penal Code.

[2] A prior jury deadlocked on the charges, after which the court declared a mistrial. This appeal follows the second jury trial.

[3] The court sentenced defendant to 15 years to life for the attempted premeditated murder, plus a consecutive 25 years to life for the section 12022.53, subdivision (d) enhancement. The court imposed and stayed a consecutive 20 years for the section 12022.53, subdivision (c) enhancement.

2

rights as stated in *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*); (4) the errors were cumulative and resulted in an unfair trial; and (5) the trial court abused its discretion by denying his motion for new trial (§ 1181, subd. (5)).

We conclude that defendant has forfeited his contentions regarding the exclusion of evidence and *Griffin* error, and in any event, we disagree with his contentions. We also conclude that defense counsel was not ineffective, and the trial court did not abuse its discretion when it denied defendant's motion for new trial. We affirm the judgment.

## FACTUAL BACKGROUND

I. *Prosecution Evidence*

This case arose from a gang-related shooting that took place on June 2, 2012, outside the apartment complex where the attempted murder victim, Efrain Hernandez, lived.[4] At trial, all of the percipient witnesses to the shooting—Efrain, his cousins Maribel Ochoa and Zaira Rochin, and Efrain's neighbor, Jazania Perez—largely denied remembering anything about the shooting. As a result, much of the prosecution's evidence at trial consisted of prior statements about the crime the witnesses made to the police, including audio recordings that Los Angeles Police Detective Bryan Fox secretly made during interviews he conducted with Ochoa, Rochin, and Perez two days after

---

[4] For ease of reading, we refer to the victim by his first name.

3

the shooting (June 4, 2012), and an interview Fox conducted with Efrain on July 25, 2012.

A. *Police Officers' Initial Response to the Shooting*

Los Angeles Police Officer Michael Beyda testified that around 9:50 p.m. on June 2, 2012, he and his partner, Officer Keith Fischer, responded to a radio call of a shooting. There were approximately 50 to 100 people congregating outside Efrain's apartment complex. Beyda located Efrain, who was lying face down in an alley behind the apartment complex. After an ambulance arrived and transported Efrain to the hospital, Beyda pulled Rochin aside to talk. Rochin told Beyda that before the shooting, she had seen two male suspects walking in the direction of Efrain as he stood outside his apartment. Efrain appeared to have recognized the suspects. The suspects chased Efrain to the alley located behind the apartment complex. Rochin then heard a gunshot and saw the same two men running away. Rochin told Beyda she recognized one of the men as "Eddie," who she said was "possibly an associate with 18th Street."

Beyda also spoke to Perez at the scene. Perez told Beyda that she had been in the back alley earlier in the night with Efrain and other individuals when a burgundy sedan drove up. Someone in the car said to Efrain, "Where you from?," and he replied "Vineland," before the car drove away. Sometime thereafter, two of the men that were inside the car chased Efrain from the front area of the apartment to the rear alley. After Perez heard a gunshot, she saw one of the suspects and recognized him as one of the men who had been sitting inside the burgundy car.

4

## B.    *Officers Meet with Efrain and His Family at the Hospital*

Officer Efren Angulo testified that around 10:30 p.m. the night of the shooting, he and Officer Aldo Rodriguez went to speak with Efrain at the hospital.  Because Efrain was undergoing X-rays when they arrived, the officers went into the waiting room and met with Efrain's family.

While in the waiting room, the officers were approached by Ochoa, who told them she had witnessed the shooting.  Standing in front of her family, Ochoa told Angulo that defendant, who she identified as Eddie Hernandez or "Menace," had shot Efrain in the back.  Ochoa recognized defendant because she had grown up with him.  Angulo informed the gang unit of defendant's identity, and in response, Rodriguez received a photograph of defendant on his cell phone.  According to Angulo, he pulled Ochoa to the side so that Rodriguez could show her the picture.  Ochoa looked at the picture and identified defendant as the shooter, though she was "unsure" because the shooting happened so fast.

After Efrain completed his X-rays, Angulo and Rodriguez spoke with him.  Angulo showed Efrain the same photograph he had shown Ochoa, and Efrain responded, "'Yes, that's him, that's the person that shot me, Eddie."[5]

---

[5]    Angulo noticed that Efrain "had a bunch of medical equipment on him" when he spoke with the officers.

C. *Unrecorded Interview of Efrain*

Detective Fox was a member of the North Hollywood gang detective unit tasked with investigating the shooting. Fox testified that he had a conversation with Efrain at the hospital on June 4, 2012. Fox did not record that conversation. According to Fox, Efrain appeared "heavily sedated," and said that a man named Menace, who Efrain later identified as defendant, was involved in the incident preceding the shooting. Efrain also told Fox that "Menace, Goblin, Ghost, Puppet or Little Puppet, and somebody else that he didn't know" from 18th Street were involved.

D. *Recorded Interviews of Ochoa, Rochin, Perez, and Efrain*

Fox secretly recorded separate interviews of Ochoa, Rochin, and Perez on June 4, 2012, and an interview with Efrain on July 25, 2012, which were played for the jury. According to Fox, it was his practice to hide a recording device during witness interviews for gang-related crimes, because witnesses are generally hesitant to cooperate and may recant their statements in the future.

1. *Ochoa*

In her trial testimony, Ochoa stated that she did not recall telling the police that defendant shot her cousin, and did not recall identifying defendant from the photograph shown to her at the hospital. Ochoa did not remember the night of the shooting, and was "terrified" of being in court and "[j]ust want[ed] to not remember" the shooting and investigation.

During her interview with Fox, Ochoa stated that she, Efrain, and other family members and friends were outside Efrain's apartment near the back alley sometime after 8:00 p.m. on June 2, 2012. At some point, defendant and another man pulled up to the alley in a dark red car. Wearing a white shirt, glasses, and blue jeans, defendant got out of the car holding a gun, approached Efrain near the apartment carport, and said, "Hey, you're Chistoso, huh?" Ochoa recognized defendant because she used to go to elementary and middle school with him. Defendant told Efrain, "Yeah, you don't—you might not remember. It's me, Menace. It's Eddie." Another man got out of the car, and defendant said "18th Street." Efrain jumped off of the car he had been sitting on, kicked defendant, and ran back to his apartment. Ochoa watched as defendant and the other man got into the car and left.

Approximately 10 minutes later, Ochoa and Efrain went outside to the front stairway area near the street. Ochoa saw the same red car pass by on the street, after which defendant and the same unknown man approached the group. Everyone but Efrain and Ochoa ran inside the apartment. Defendant and his cohort ran by Ochoa and followed Efrain into the back alley; both men were carrying guns in their hands. After she followed the men into the alley, Ochoa saw defendant fire three shots from a dark revolver. Ochoa thought the second shot hit Efrain in the back. When Efrain fell to the ground, Ochoa ran after the men and watched as they got inside their car and drove away.

### 2.    *Rochin*

Rochin testified that she could not remember telling officers that defendant was involved in the shooting.  She testified that she could not have known that the shooter was defendant because she "was on the other side of the wall" and saw nothing.  Rochin admitted that before she spoke with officers on June 4, 2012, she overhead her family (including Ochoa) and friends talk about the suspects' identities.  She agreed that overhearing that discussion had influenced her statements to the police.

In her interview with Fox, Rochin stated that five men inside a red car approached her and the others near the rear apartment carport around 8:45 p.m.  A man she identified as "Menace," who wore blue jeans, a white T-shirt, and glasses, got out of the car and asked Efrain, "Where are you from?" and "we know who you are."  Another man got out of the car and pulled a shank or other item from his pocket.  Efrain told Rochin and others to run before he jumped off of a car, kicked Menace backwards, and ran inside the apartment.

When the group went back outside, Rochin saw the same red car drive by "really fast" before two men approached the group.  Rochin ran inside the apartment, but came out after she heard gunshots.  Rochin saw "the two guys that shot" Efrain.  Despite identifying the men as "Eddie and the other guy," Rochin did not see either man holding a gun.  Following the shooting, Rochin spoke with an unknown man who told her that Menace was defendant.  Rochin responded, "Who's Menace?  . . .  I know him by Eduardo or Eddie."  "And that's when we went on Facebook, me and Marlene, and were looking for him to see if

8

we would find anything—like pants and anything, which we kind of did, and she showed you."[6]

3. *Perez*

Perez testified that her identification of defendant as a possible suspect was made after she had spoken with Ochoa and the family at the hospital, and was not based on her personal observations.

In her interview with Fox, Perez said that she was standing inside the apartment garage door when a car stopped near the rear carport on June 2, 2012. Perez saw a guy wearing a white T-shirt, jeans, and sunglasses get out of the car. Perez did not see the man's face and did not hear if he had mentioned anyone's name. Perez did not see anyone else get out of the car. When Efrain jumped off of the car, everyone ran inside the apartment.

Perez was also outside in the front apartment stairwell when she saw the guy with the white T-shirt; she heard Efrain say "Oh, fuck. Run." Perez and others ran inside the apartment, and Efrain ran to the back. While inside Efrain's apartment, Perez heard gunshots. She ran toward the back alley and saw the same man in the white T-shirt and another man wearing a black shirt and jeans walking away. Despite telling Fox that she did not know if defendant was the man in the white T-shirt, Perez identified defendant from a six-pack photographic lineup as the person in the white T-shirt.

---

[6] Rochin did not specify who Marlene was, and whether she meant to say Maribel (Ochoa).

### 4. *Efrain*

At various times during his trial testimony, Efrain stated that defendant was not the shooter, that Efrain had not seen defendant the night of the shooting, and that he did not know who had shot him in the back. Efrain had told Fox "what other people thought they [had] seen," because he "was going by what everybody else was saying." Ochoa had told Efrain that defendant was the shooter, and if she "would have said a different name, then I probably would have done the same too, that it was that guy." Moreover, Efrain testified that he had lied to investigators because he wanted to "direct" the investigation toward the 18th Street gang, which at the time was a rival gang of Vineland.[7] The gunshot wound to his spinal cord left Efrain disabled.

During his interview with Fox on July 25, 2012, Efrain summarized the incident preceding the shooting with substantially the same facts as Ochoa, Rochin, and Perez. However, Efrain claimed that did not remember what happened after he began to run to the back alley. Efrain stated that he did not recognize the guy in a white T-shirt and jeans until after the shooting, when one of his friends told him that it "was Eddie. That was Menace." According to Efrain, defendant and "the other guys who [were] with him" knew Efrain's home address.

---

[7] Efrain admitted that he was a member of the Sun Valley Vineland Boys street gang, and went by the names "Dough Boy" and "Chistoso." Efrain knew defendant as "Menace" from 18th Street.

## E.  *The Gang Evidence*

Officer Luis Urbina testified as the prosecution's gang expert. Urbina had met defendant and knew him as Menace from 18th Street, a violent gang that had committed shootings, assaults with deadly weapons, robberies, vandalisms in 2012.  Based on a hypothetical scenario based on facts identical to this case, Urbina concluded that the crime had been committed for the benefit of, in association with, or at the direction of a criminal street gang.

## F.  *Cell Phone Analysis*

Fox testified that defendant and Efrain lived in close proximity to each other.  Fox calculated the time it took to drive from defendant's residence to the alley behind Efrain's apartment.  Observing all traffic and speed laws, Fox concluded that it took two minutes six seconds to complete the drive.

Special Agent Michael Easter reviewed phone records for defendant's cell phone on June 2, 2012.  Based on the phone's communication with various cell towers, Easter concluded that between 9:00 p.m. and 9:07 p.m., defendant's phone was in the area of his and Efrain's apartment.  Consistent with the witnesses' statements that the red car had driven away, defendant's phone was positioned away from the area at 9:32 p.m.  Finally, around 9:52 p.m., when officers received the radio call of a shooting, defendant's phone was in the area of where the shooting had occurred.

11

## II. *Defense Evidence*

Testifying on his own behalf, defendant explained that he and Efrain were best friends in elementary and middle school, but lost contact after both joined rival gangs. Defendant chose the moniker "Menace." He knew Efrain belonged to the Vineland gang, used the gang moniker "Chistoso," and lived in Vineland territory.

Defendant testified that the day before the shooting, he was with a woman (Gina). The next day, defendant met with another woman (Lola), and attempted to arrange a sexual liaison among Gina, Lola, and himself. Around 9:04 p.m., defendant messaged his girlfriend (Cynthia) and said, "All right, Ima go on a trip, some shit just happened, you know what time it is, girl." Defendant used that message "when I don't want to deal with any female's B.S."

Around 9:32 p.m., defendant walked with Lola and his male friend to a smoke shop to pick up a pipe. Defendant provided no explanation for why his cell phone was in Vineland territory at that time, as opposed to the area near the smoke shop. Nevertheless, defendant testified that he and Lola returned to her apartment, located in close proximity to his own apartment, where he remained all night.

## DISCUSSION

### I. *Defense Counsel Did Not Render Ineffective Assistance of Counsel*

Defendant contends his trial counsel rendered ineffective assistance of counsel, because she did consult with or call to testify an eyewitness identification expert who could describe "the ill-effects of an influenced group identification." We disagree.

12

A.      *Relevant Proceedings*

Following the verdict, and represented by new counsel, defendant moved for a new trial, arguing (among other things) that his trial counsel was ineffective for failing to consult with and call an eyewitness identification expert. He argued that such an expert would have "benefited" the jury by demonstrating how Rochin's supposed suggestion to the other witnesses that defendant was the shooter might have influenced the witness' out-of-court identifications. He also suggested that the expert would discuss "'Rochin's 'tip'" to the investigating officers, which led the officers to show a single photograph of defendant to the witnesses.[8]

At the hearing on defendant's motion, defense trial counsel testified that despite consulting with eyewitness identification experts in the past, she did not do so in this case because the eyewitnesses "were a jumbled mess and they didn't want to testify, and when they did testify . . . it was a mess." Trial counsel confirmed that she understood the issues created by the susceptibility of the witnesses' identification by the suggestion from others that defendant was a possible suspect. She had also researched suggestive show-ups and had "went into detail about that suggestive single photo show up" during trial.

---

[8]     Defendant's argument was premised on police reports that had been generated the night of the shooting. The reports, which were never admitted into evidence at trial, did not mention anyone other than Rochin who had identified defendant as a possible suspect.

The court found that trial counsel did not render ineffective assistance. Given the danger of wasting substantial time, the court reasoned that it would have excluded the expert from testifying. It also agreed that trial counsel had adequately cross-examined each witness and addressed the theories during argument and with jury instructions, including CALCRIM No. 315.[9]

B. *Governing Law*

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686–694.) "'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.]'" (*People v. Gamache* (2010) 48 Cal.4th 347, 391 (*Gamache*).)

---

[9]     The jury was instructed with CALCRIM Nos. 226 (credibility of witnesses), 302 (evaluating conflicting evidence), and 315 (eyewitness identification). The instructions provided that the jury "alone must judge the credibility or believability of the witnesses," and provided two non-exclusive lists of factors to evaluate the witnesses' testimony and identification. Those factors include whether the "witness's testimony [was] influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided"; whether "the witness [was] asked to pick the perpetrator out of a group"; and whether "the witness ever change[d] his or her mind about the identification."

Defendant bears the burden of establishing ineffective assistance of counsel. (*Gamache*, *supra*, 48 Cal.4th at p. 391.) We indulge every "'presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.'" (*Ibid.*)

C.    *Analysis*

Defendant has failed to prove deficient performance or resulting prejudice in this case. The decision to call an expert witness to testify about the psychological factors impacting witness identification is a tactical matter for counsel to decide. (E.g., *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 995; *People v. McDonald* (1984) 37 Cal.3d 351, 377 (*McDonald*), overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896.) Despite her familiarity with eyewitness identification experts, defense counsel did not utilize one in this case because the witnesses' testimony was "a jumbled mess" that did not warrant expert testimony. Affording this tactical decision the deference it is due under the available facts (*People v. Hinton* (2006) 37 Cal.4th 839, 876), counsel's decision was reasonable.

Rochin, Perez, and Efrain testified that their out-of-court identifications of defendant as a possible suspect had been influenced by statements or discussions that Ochoa had with them or other family members. Efrain highlighted the significance to him of Ochoa's statements: he testified that he "probably would have" identified another person as the shooter if Ochoa had told him a different name.

15

Because the witnesses themselves undercut the reliability of the out-of-court identifications, it is not at all clear what additional exculpatory inferences could have been drawn if an expert had testified. (See *McDonald, supra*, 37 Cal.3d at p. 367 [expert testimony should be excluded "when it would add nothing at all to the jury's common fund of information"].)

Moreover, the trial court's additional basis for denying the motion for new trial (i.e. that it would have excluded the expert from testifying) further suggests trial counsel's decision was not ineffective. (See *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["[c]ounsel is not ineffective for failing to make frivolous or futile motions"].) To the extent defendant disagrees with the trial court's reasoning, he has failed to provide any cogent legal argument. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335 [court may deem matter waived if party's briefs do not provide legal argument and citation to authority].)

The cases that defendant has relied upon, *Caro v. Woodford* (9th Cir. 2002) 280 F.3d 1247 (*Caro*) and *Dugas v. Coplan* (1st Cir. 2005) 428 F.3d 317 (*Dugas*), are readily distinguishable. (See *Caro, supra*, at pp. 1254–1255 [defense counsel declared he had no strategic reason for failing to investigate the physiological effect of exposure to neurotoxicants]; *Dugas, supra*, at pp. 329–330 [counsel had never tried an arson case, lacked any knowledge of arson investigation, and could not rebut the prosecutor's own arson expert at trial].)

Aside from defendant's failure to prove deficient performance, we conclude no prejudice exists on this record; it is not reasonably probable

that a result more favorable to defendant would have been reached had the expert witness testified.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  We reach this conclusion for three reasons.

First, the trial involved "vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt."  (*Perry v. New Hampshire* (2012) 565 U.S. 228, 233; accord, *People v. Sanders* (1995) 11 Cal.4th 475, 510.)  Trial counsel discussed theories of bias and influence through group identification and the suggestiveness of the single photograph during opening argument, cross-examination, and closing argument.  The jury was also instructed to consider bias and influence when determining credibility of witness testimony and identification.  We presume the jury followed those instructions.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Second, the out-of-court eyewitness identifications of defendant as the shooter (through Ochoa and Efrain) and possible suspect (through Rochin and Perez), though introduced through the witnesses' prior statements to the police, were compelling, and were corroborated by evidence that afforded them independent reliability.  (*McDonald*, *supra*, 37 Cal.3d at p. 377.)  Defendant messaged his girlfriend at 9:04 p.m.—around the time of the initial confrontation with Efrain—that he was going somewhere after the occurrence of something that had "just happened."  As established by his cell phone records, defendant was around Efrain's apartment during the initial confrontation and the shooting.

17

Finally, the theory defendant sought to establish through an expert witness—that Rochin had suggested to the others that defendant was the shooter—is unsupported by any citation to the record, and appears incorrect. Though Rochin was the first person to identify defendant as a possible suspect, she never specified if he was the shooter, and she could not do so because she did not witness the actual shooting. The statements precipitating the single photograph were made by Ochoa—the only witness (other than Efrain) who had seen the shooting. Having failed to establish deficient performance and prejudice, defendant's claim fails.

II.    *Evidence of the Witnesses' Gang Affiliation*

Defendant challenges the trial court's exclusion of evidence that Ochoa, Rochin, and Perez had "gang tendencies." It is not at all clear from defendant's appellate briefs what evidence he claims was erroneously excluded. Having reviewed the record, it appears the excluded evidence includes (1) a purported Facebook photograph of Ochoa posing with an assault rifle alongside alleged gang members, and (2) defendant's opinion that Ochoa, Rochin, and Perez were "gang affiliates." We conclude that the issue is forfeited, and meritless in any event.

A.    *Relevant Proceedings*

Prior to opening statements, the prosecution moved to exclude a Facebook photograph of Ochoa holding what was alleged to be an assault rifle alongside gang members. Though defense counsel could

18

not specify when the photograph was taken, she argued that the photograph had been admitted in the prior trial and tended to prove Ochoa was "an associate" of a gang. The court excluded the photograph. Even assuming the photograph had been taken around the time of the shooting, the court found the photograph was irrelevant to any issue at trial.

During his testimony at trial, defendant stated that Ochoa was gang affiliated. When his counsel asked "[w]hat does that mean?," the prosecutor objected. At a sidebar conference, defense counsel argued that defendant's opinion was based on viewing photographs of Ochoa on Facebook "with gangsters making gang signs." Counsel asserted the photographs were relevant because they contradicted Ochoa's testimony that she was afraid of gangs. The prosecutor questioned the authenticity of the photograph. The court questioned whether defendant's opinion of Ochoa's gang affiliation was based on his personal knowledge. Defense counsel replied that defendant had personal knowledge because he and Ochoa "hung out together." The prosecutor responded by calling the court's attention to defendant's testimony moments before, wherein defendant stated "I never had a conversation with [Ochoa] with the exception, I went to the beach with this family on one occasion [around age 11] and . . . yeah, I conversated [*sic*] with her that day and that day only." The court tabled the issues, and requested that defendant testify on other matters so the parties could discuss the evidentiary issues outside the jury's presence.

During a break in the proceedings, outside the presence of the jury, the court referred to defendant's prior testimony that he believed

19

Ochoa was gang affiliated, and questioned whether defendant intended to expand on that testimony. Defense counsel responded that defendant sought to introduce his own testimony as to Ochoa's "continuing presence . . . in the gang" in junior high or middle school.

The court questioned defendant on his understanding of Ochoa's gang affiliation. Defendant responded that Ochoa was "still gang affiliated to this day, all the witnesses are." By "affiliated," defendant meant that each witness "kick[ed] it with gang members. When they were relocated, they didn't leave to another spot, they moved into— deeper into the heart of their neighborhood. Their family members are gang members. [¶] All this stuff about being gang activity—Zaira Rochin, her husband is a gang member." The defendant noted he had "pictures of them throwing up gang signs, all of them." Besides the photographs, defendant noted that Ochoa's family and ex-boyfriend were gang members.

Having heard defendant's offer of proof, the court excluded defendant's opinion about the witnesses' gang affiliation because it lacked a proper a foundation, and was based on hearsay and Facebook photographs, which were not authenticated. The court also noted the opinion was irrelevant, as Urbina had already testified that gang members do not cooperate with police or during trial for fear of retaliation. Finally, if the court were "wrong in all of that, I'm excluding it under 352 as time consuming and more prejudicial than probative and would cause confusion to the jurors."

20

B.    *Analysis*

On appeal, defendant contends the court erred in excluding the evidence, because it would have undermined the credibility of the witnesses "who testified they were scared . . . frightened women and therefore uncooperative at trial, and to show an incentive for them to finger [defendant], a rival gang member, for the shooting."

Defendant has forfeited any challenge to the exclusion of evidence that was intended to "show an incentive" for the witnesses to identify defendant, "a rival gang member, for the shooting."  Defendant never argued in the trial court that the evidence was relevant for this purpose.  (See Evid. Code, § 354, subds. (a), (c); *In re Mark C.* (1992) 7 Cal.App.4th 433, 444, citing *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 17–18.)  Moreover, defendant has not addressed the court's independent bases for excluding the evidence as inadmissible hearsay and without foundation.  (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 ["When an appellant fails to raise a point . . .  we treat the point as waived"]; see also *People v. Stanley* (1995) 10 Cal.4th 764, 793).[10]

Even assuming defendant has not forfeited the contention, we conclude that the court did not abuse its discretion in excluding the evidence.  (See *People v. Sanchez* (2019) 7 Cal.5th 14, 54.)

With regard to the Facebook photograph of Ochoa, defendant has failed to establish an adequate foundation for its admission.

[10]    The only law that defendant has cited in his appellate briefs is Evidence Code section 352, a case defining "prejudice" under section 352, and the applicable standard of review of the exclusion of evidence.

21

"Authentication of a writing, including a photograph, is required before it may be admitted in evidence. ([Evid. Code,] §§ 250, 1401.) Authentication [requires] 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' (§ 1400)." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266; see Evid. Code, § 403, subd. (a)(3).) Evidence to authenticate a photograph may be provided by the person taking the photograph, a person who witness the event being recorded, other witness testimony, circumstantial evidence, content and location, and "'any other means provided by law,'" including a statutory presumption. (*People v. Goldsmith*, *supra*, at p. 268.) Defendant never attempted—at trial or in this appeal—to establish an evidentiary basis regarding any specific photograph, such as who had taken the photographs, when and where they were taken, and who (other than Ochoa) was in the photographs.

Defendant also failed to establish an adequate foundation for his opinion that Ochoa, Rochin, and Perez were gang affiliated. A defendant may provide an opinion only on things "[r]ationally based on" his own perception, and "[h]elpful to a clear understanding of his testimony." (Evid. Code, § 800.) "'By contrast, when a lay witness offers an opinion that goes beyond the facts the witness personally observed, it is . . . inadmissible.' [Citation.]" (*People v. Jones* (2017) 3 Cal.5th 583, 602.) Defendant never established that he personally observed Ochoa, Rochin, or Perez engaging in "gang affiliated" activity. Because his opinion was based on things he had learned from others

(either directly or through Facebook), his opinion was properly excluded. (Compare *ibid.* [lay opinion that defendant had left gang membership was inadmissible; witness's discussions with defendant, gang members, and other people constituted inadmissible hearsay].)

Finally, the court did not abuse its discretion in excluding the evidence under Evidence Code section 352. A trial court may exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, or create substantial danger of confusing the issues or misleading the jury. (Evid. Code, § 352; see *People v. Wheeler* (1992) 4 Cal.4th 284, 296 [trial courts have broad discretion to rule under Evid. Code, § 352].) Even assuming it was potentially relevant (Evid. Code, § 780, subd. (f)), the evidence was cumulative of other less inflammatory evidence establishing witness bias. Defendant had already stated his opinion that Ochoa was gang affiliated, and the court did not strike that testimony. The witnesses also established that through Efrain, they were either affiliated or familiar with the Vineland gang, a rival of 18th Street, and might have had a motive to identify a rival gang member as the perpetrator. The court did not err in concluding that evidence of the witnesses' supposed relationships with other Vineland gang members was cumulative and would necessitate undue consumption of time. (See *People v. Hamilton* (2009) 45 Cal.4th 863, 946 [courts may "'prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues'"].)

III.    *Griffin Error*

Defendant contends the prosecutor "lashed out at [defendant] and challenged him in front of the jury to testify," in violation of his constitutional rights as stated in *Griffin, supra,* 380 U.S. at pages 614–615.  Defendant forfeited this contention on appeal by failing to raise it at trial.  Regardless, the contention lacks merit.


A.    *Relevant Proceedings*

During her cross-examination of Efrain, defense counsel inquired whether he had been shown a six-pack photographic lineup of the suspects.  As Efrain testified, defendant interjected and said, "He's not talking about the six pack, he's talking about the . . . picture."  Efrain agreed with defendant that he was only shown the single photograph, at which point defendant stated "[t]hat's the actual picture."  During redirect examination, the prosecutor showed Efrain the single photograph and inquired if he recognized defendant.  After defense counsel objected, the prosecutor (apparently referring to a comment made by defendant) stated:  "I would ask the court to admonish the defendant to stop speaking loudly.  He's--you know, he has a lawyer there to speak for him.  If he wants to testify, he can take the stand and he shouldn't be speaking in court."  The prosecutor continued his redirect examination of Efrain.

Later that day, the trial court admonished the jury as follows:

> "Before lunch a comment was made by one of the prosecutors that I missed, focusing on the testimony of the witness.  So I just want to give you an admonition at this time.

24

"As I explained to you before the trial, the defendant has an absolute right not to testify. This is guaranteed to him by the Fifth Amendment.

"But, however, a defendant cannot testify or attempt to provide evidence for the benefit of the jurors from counsel table. He actually has to take the witness stand and be sworn under oath and be cross-examined. Okay?

"However, having said that, a prosecutor is not allowed to comment on a defendant's right to testify or to remain silent or to challenge the defendant to testify.

"So if you heard any comments about that from the— one of the prosecutors, you should disregard it, not let it enter your deliberations in any way."

After the People's case, and outside the jury's presence, the prosecution advised defendant of his right to testify.[11] In response, defendant stated, "Yes, sir, I think I have to testify." The prosecutor replied, "Well, sir, you don't have to testify. The burden is always on the People to prove our case beyond a reasonable doubt, so it's not that you have to testify, this is--it must be your election to testify." Defendant stated, "No, it's my decision, I'm choosing to testify." He stated again that it was his decision to testify, and that no one promised or threatened him to testify. Defendant wanted to testify of his own free will because it was in his "best interest in the defense." Defense counsel concurred in defendant testifying.

---

[11] The prosecutor advised defendant that the "right to testify" was "yours and yours alone and no one can force you and no one can challenge you to do it, this is totally up to you." The prosecutor continued: "I can't use it against you, the jury cannot use it against you, no one can use it against you if you elect not to testify. [¶] However, you also have an absolute constitutional right to testify on your own behalf. Is it your desire to take the stand today?"

25

In his motion for new trial following the verdict, defendant asserted the prosecutor's request for an admonition constituted *Griffin* error because it challenged defendant to testify. At the hearing on defendant's motion, defense counsel conceded that defendant may have spoken directly to Efrain during redirect examination so that defendant could clarify the prosecutor's question. Defense counsel also stated that defendant chose to testify because he wanted to tell his story. Defendant never told counsel that he felt challenged by the prosecutor.

The court found no *Griffin* error. It reasoned that the prosecutor's request for an admonition was warranted, as defendant had spoken out frequently during trial, which may not be fully reflected in the trial transcripts.

B.    *Analysis*

Defendant has forfeited this issue by failing to object to the prosecutor's statements during Efrain's testimony. (*People v. Valdez* (2004) 32 Cal.4th 73, 127 (*Valdez*); *People v. Mitcham* (1992) 1 Cal.4th 1027, 1050.) Nor did raising the issue in a motion for new trial revive it for appellate review. (*People v. Williams* (1997) 16 Cal.4th 153, 254.)

To avoid forfeiture, defendant now contends his counsel was ineffective for failing to object. However, defendant did not raise an ineffective assistance claim on this issue in his opening brief, and waited to assert ineffective assistance in his reply brief. Defendant has forfeited the claim by his failure to raise it in his opening brief. (*People*

*v. Rangel* (2016) 62 Cal.4th 1192, 1218; *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)

In any event, there was no *Griffin* error, which requires "'comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.'" (*United States v. Robinson* (1988) 485 U.S. 25, 30 (*Robinson*), quoting *Griffin, supra*, 380 U.S. at p. 615.) Viewing the prosecutor's request for an admonition, and the court's subsequent admonition in context, it is clear that both were fair responses to defendant's disruptive behavior during trial. (*Robinson, supra*, at p. 32.) Defendant had no right to personally examine the witnesses or testify from counsel table during the People's case-in-chief. (See Evid. Code, § 710; *Faretta v. California* (1975) 422 U.S. 806, 819, 835.) Defendant violated those prohibitions by interjecting over counsel and making statements about the facts during Efrain's testimony. The prosecutor's comments and the court's admonition did not suggest a failure to testify would be evidence of defendant's guilt. (Compare *People v. Gomez* (1967) 252 Cal.App.2d 844, 855–856 [admonition that defendant's "'opportunity to talk in this case has expired. He could have taken the stand and testified. He elected not to do so. Therefore, he must remain silent. He can tell his attorney what he wants to tell him'" did not constitute *Griffin* error], disapproved on another ground in *People v. Tribble* (1971) 4 Cal.3d 826, 832.) And, obviously, because defendant chose to testify—and did so for reasons having nothing to do

27

with the prosecutor's comment—there was no danger that the jury might infer guilt based on a failure to testify.[12]

4.     *Cumulative Error*

There being no errors to accumulate, defendant's assertion that cumulative error resulted in an unfair trial necessarily fails.  (*Valdez, supra,* 32 Cal.4th at p. 139.)

5.     *Motion for New Trial*

As discussed, defendant filed a motion for new trial following the verdict, and argued inter alia that trial counsel rendered ineffective assistance by failing to consult with or call an eyewitness identification expert, and that the prosecutor's request to admonish defendant constituted *Griffin* error.[13]  The People opposed the motion, and

---

[12]     The single case on which defendant relies, *People v. Guzman* (2000) 80 Cal.App.4th 1282, is readily distinguishable.  In *Guzman,* the prosecutor in a hit-and-run and assault case tried to support the victim's credibility by emphasizing that, while the defendant tried to flee the crime scene, the victim cooperated with the police and came to court to testify.  (*Id.* at pp. 1285–1286.)  The prosecutor repeatedly mentioned the victim's willingness to testify during his rebuttal argument, and had used a demonstrative chart to further his point.  (*Id* at p. 1286.)  In finding *Griffin* error, the court noted that the prosecutor had "repeatedly and flagrantly" focused on defendant's right to remain silent by consistently drawing the jury's attention to the fact he had not taken the stand.  (*Id.* at pp. 1289–1290; see *id.* at p. 1290 ["This is not a case where a single isolated comment may have indirectly touched on the defendant's failure to testify"].)

[13]     Defendant also raised eight other claims of ineffective assistance of counsel.  Defendant has not raised those claims this appeal.

defendant filed a motion in reply.  The trial court denied the motion for new trial.

Defendant contends the trial court erred in denying the new trial motion based on the first three claims he has asserted in this appeal. Our prior analysis of these contentions disposes of defendant's additional claim that the trial court erred in denying the motion for a new trial on these grounds.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

MANELLA, P. J.

CURREY, J.